STEVEN G. KALAR
Federal Public Defender
Northern District of California
ANGELA CHUANG
Assistant Federal Public Defender
AMY SENIA
Special Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Angela_Chuang@fd.org

Counsel for Defendant Weiss

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 20–00013 CRB |
| Plaintiff, | **MOTION TO DISMISS THE INDICTMENT** |
| v. | |
| HOWARD WEISS, | **Court:**           Courtroom 6, 17th Floor |
| Defendant. | **Hearing Date:**   April 15, 2020 |
| | **Hearing Time:**   1:30 p.m. |

TO:    THE UNITED STATES, PLAINTIFF; AND DAVID ANDERSON, UNITED STATES ATTORNEY; AND ASSISTANT UNITED STATES ATTORNEY CHRISTINA LIU

PLEASE TAKE NOTICE that on April 15, 2020 at 1:30 p.m. in the courtroom of the Honorable Charles R. Breyer, or as soon thereafter as the matter may be heard, counsel for Defendant Howard Weiss will move the Court to dismiss the indictment against him on the grounds that the instant prosecution infringes on his First Amendment rights and charges a violation of an unconstitutionally overbroad and vague statute. This motion is based on the attached memorandum of points and authorities, the Constitution of the United States of America, applicable statutory and case law, and any argument made at the motion hearing.

i

1

# TABLE OF CONTENTS

2    Introduction...........................................................................................................1

3    Background...........................................................................................................1

4    Argument .............................................................................................................2

5          I.     The Government Cannot Meet its Burden to Prove the Statute as Applied to Mr.
Weiss's Core Political Speech Comports with the First Amendment. ............................2

6

7              A.     The Government Cannot Meet its Burden to Prove Mr. Weiss's Language Falls
into one of the Narrow Categories of Proscribable Speech. ...............................3

8              B.     Nor Can the Government Meet its Burden to Prove the Statute Passes Strict
Scrutiny as Applied to Mr. Weiss's Speech........................................................5

9

10        II.    On its Face, Section 223 (a)(1)(C) is Unconstitutionally Overbroad and Vague. ..........10

11              A.     The statute's application to the Internet fundamentally changes its breadth. .....11

12              B.     The statute's lack of definitions exacerbate its vagueness and overbreadth in the
internet context.................................................................................................12

13              C.     The statute's intent requirement cannot carry the day. ......................................13

14    Conclusion .........................................................................................................14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Federal Cases**

*Ashcroft v. American Civil Liberties Union,*
   535 U.S. 564 (2002) ................................................................................................. 3

*Ashcroft v. American Civil Liberties Union,*
   542 U.S. 656 (2004) ................................................................................................. 3

*Boos v. Barry*
   485 U.S. 312 (1988) ................................................................................................. 8

*Brown v. Entm't Merchants Ass'n,*
   564 U.S. 786 (2011) ............................................................................................. 6, 9

*Buckley v. American Constitutional Law Found.,*
   525 U.S. 182 (1999) ................................................................................................. 9

*Church of the Am. Knights of the Ku Klux Klan v. City of Erie,*
   99 F.Supp.2d 583 (W.D. Pa. 2000) ...................................................................... 12

*City of Chicago v. Morales,*
   527 U.S. 41 (1999) ................................................................................................. 10

*City of Los Angeles v. Patel,*
   135 S.Ct. 2443 (2015) ........................................................................................... 10

*Cohen v. California,*
   403 U.S. 15 (1970) .............................................................................................. 3, 4

*Eu v. San Francisco Cty. Democratic Cent. Comm.,*
   489 U.S. 214 (1989) ................................................................................................. 9

*Fed. Election Comm'n v. Massachusetts Citizens for Life, Inc.,*
   479 U.S. 238 (1986) ................................................................................................. 1

*Fed. Election Comm'n,*
   551 U.S. ............................................................................................................. 13, 14

*Foti v. City of Menlo Park,*
   146 F.3d 629 (9th Cir. 1998) ................................................................................... 6

*Houston v. Hill,*
   482 U.S. 451 (1987) ................................................................................................. 3

*In re Nat'l Sec. Letter,*
   863 F.3d 1110 (9th Cir. 2017) .............................................................................. 3, 8

*Kramer v. Price,*
   712 F.2d 174 (5th Cir. 1983) ................................................................................. 10

*McIntyre v. Ohio Elections Comm'n,*

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

514 U.S. 334 (1995) .......................................................................................... *passim*

*Meyer v. Grant,*
    486 U.S. 414 (1988) ................................................................................ 7

*New York ex rel. Spitzer v. Operation Rescue Nat'l,*
    273 F.3d 184 (2d Cir. 2001) ................................................................. 5

*R.A.V. v. City of St. Paul, Minn.,*
    505 U.S. 377 (1992) ......................................................................... 3, 4

*Reed v. Town of Gilbert, Ariz.,*
    135 S. Ct. 2218 (2015) ......................................................................... 5

*Reno v. American Civil Liberties Union,*
    521 U.S. 844, 850 (1997) ............................................... 11, 12, 13, 14

*Rodriguez v. Maricopa County Cmty. College Dist.,*
    605 F.3d 703 (9th Cir. 2009) ................................................................ 4

*Saxe v. State Coll. Area Sch. Dist.,*
    240 F.3d 200 (3d Cir. 2001) ................................................................. 4

*Snyder v. Phelps,*
    562 U.S. 443 (2011) ............................................................................. 8

*Sypniewski v. Warren Hills Reg'l Bd. of Educ.,*
    307 F.3d 243 (3d Cir. 2002) ............................................................... 12

*Tschida v. Motl,*
    924 F.3d 1297 (9th Cir. 2019) .............................................................. 5

*United States v. Alvarez,*
    617 F.3d 1198 (9th Cir. 2010) ...................................................... 2, 3, 5

*United States v. Bagdasarian,*
    652 F.3d 1113 (9th Cir. 2011) .............................................................. 4

*United States v. Bowker,*
    372 F.3d 365 (6th Cir. 2004) ..................................................... 7, 10, 11

*United States v. Cassidy,*
    814 F.Supp.2d 574 (D.Md.2011) .................................................... 2, 9

*United States v. Eckhardt,*
    466 F.3d 938 (11th Cir. 2006) .......................................................... 7, 10

*United States v. Osinger,*
    753 F.3d 939 (9th Cir. 2014) ........................................................... 3, 10

*United States v. Popa,*
    187 F.3d 672 (D.C. Cir. 1999) .................................................... 5, 6, 7, 9

*United States v. Schulman,*
817 F.2d 1355 (9th Cir. 1987) ................................................................. 2

*United States v. Stevens,*
559 U.S. 460 (2010) ............................................................. 6, 10, 13

*United States v. Toltzis,*
2016 WL 3479084 (N.D. Cal. June 27, 2016) .............................. 2

*United States v. Waggy,*
936 F.3d 1014 (9th Cir. 2019) ........................................... 4, 7

*United States v. Williams,*
553 U.S. 285 (2008) ................................................................. 13

*Washington State Grange v. Washington State Republican Party,*
552 U.S. 442 (2008) .................................................................. 14

*Watts v. United States,*
394 U.S. 705 (1969) ............................................................ 3, 5, 12

*Wurtz v. Risley,*
719 F.2d 1438 (1983) ........................................................... 10, 12

**Federal Statutes**

§ 222 ............................................................................................. 11

47 U.S.C. § 223 ................................................................. *passim*

v

1

2                                        **INTRODUCTION**

3          This case tests a core feature of our democracy: the ability to criticize and insult public leaders

4    without fear of government retribution. "Freedom of speech plays a fundamental role in a democracy;

5    as [the Supreme] Court has said, freedom of thought and speech 'is the matrix, the indispensable

6    condition, of nearly every other form of freedom.'" *Fed. Election Comm'n v. Massachusetts Citizens*

7    *for Life, Inc.*, 479 U.S. 238, 264 (1986). The government charges Mr. Weiss with a felony for sending

8    eight messages through Senator Mitch McConnell's official website contact form over the course of a

9    year. Undoubtedly, Mr. Weiss's messages contain offensive language. Many would find his choice of

10   words distasteful. But for constitutional purposes, he made no true threats or otherwise unprotected

11   comments. Where pure speech amounts to nothing more than histrionic critiques of a government

12   official, the First Amendment provides an impenetrable shield from criminal prosecution. Moreover,

13   the government charges Mr. Weiss under a statute which is itself constitutionally infirm. The statute's

14   potential application to a vast amount of protected internet speech, paired with its failure to define

15   "harass, abuse, and threaten," render it facially unconstitutional as both vague and overbroad. Because

16   the statute violates the First Amendment, both as applied to this case and facially, the prosecution of

17   Mr. Weiss cannot proceed. The Court must dismiss the indictment with prejudice.

18                                       **BACKGROUND**

19         Senate Majority Leader Mitch McConnell's official website invites the public to contact him

20   electronically through a fillable form. *See* Declaration of Angela Chuang ("Chuang Decl."), Exhibit A,

21   Mitch McConnell Website Contact Form. On the contact form, McConnell tells website visitors: "I

22   welcome your thoughts and concerns and would like to encourage you to share them with me." *Id*. He

23   cheerfully adds, "I look forward to hearing from you!" Due to the high volume of messages his office

24   receives, responses "may take to up to 45 days." *Id*.

25         Howard Weiss, a fifty-eight-year-old Bay Area native and politically-conscious citizen, is no fan

26   of the Republican Party in general and Senator McConnell's political agenda in particular. Between

27   October 2018 and October 2019, Mr. Weiss authored a total of eight messages expressing his

28   displeasure with Senator McConnell's politics and submitted them through McConnell's online contact

                                              1

form under various fictional names. *See* Chuang Decl., Ex. B, Indicted Messages. His messages pulled no punches. As was his right in this country, he used caustic, vicious, hateful, racist language to criticize Senator McConnell.

On January 16, 2020, the government indicted Mr. Weiss for one count of violating 47 U.S.C. § 223 (a)(1)(C), Harassing Use of Telecommunications Device. Enumerating the eight times Mr. Weiss filled out Senator McConnell's online contact form, the indictment alleges Mr. Weiss "utilize[d] a telecommunications device, whether or not conversation or communication ensued, without disclosing his identity and with intent to abuse, threaten, and harass any specific person." Mr. Weiss now moves the Court to dismiss the indictment on the basis that the prosecution violates the First Amendment under the Free Speech Clause of the United States Constitution.

## ARGUMENT

Federal Rule of Criminal Procedure 12(b)(1) permits parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Courts may grant a pretrial motion to dismiss the indictment where it seeks to resolve questions of law, not fact. *United States v. Schulman*, 817 F.2d 1355, 1358 (9th Cir. 1987). Such a situation arises when, as here, a defendant asserts that the statute under which he faces prosecution violates the First Amendment as a matter of law.[1] *See*, *e.g.*, *United States v. Alvarez*, 617 F.3d 1198, 1201 (9th Cir. 2010), *aff'd*, 567 U.S. 709 (2012); *United States v. Toltzis*, No. 14-CR-00567-RMW, 2016 WL 3479084, at *3 (N.D. Cal. June 27, 2016) (J. Whyte); *United States v. Cassidy*, 814 F.Supp.2d 574, 588 (D.Md.2011).

**I.   The Government Cannot Meet its Burden to Prove the Statute as Applied to Mr. Weiss's Core Political Speech Comports with the First Amendment.**

The First Amendment to the United States Constitution commands that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The First Amendment exists "to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). Thus, courts "presumptively protect all speech against government interference, leaving it to the government to demonstrate, either

---

[1] Should the Court deny his motion, Mr. Weiss reserves his right to dispute at trial that he had the subjective intent to abuse, threaten, and harass.

through a well-crafted statute or case-specific application, the historical basis for or a compelling need to remove some speech from protection." *Alvarez*, 617 F.3d at 1205. The prosecution of a defendant on the basis of his speech therefore violates the First Amendment unless the government can carry its heavy burden of proving either: (1) the defendant's speech fits into one of the well-defined categories of speech that "can be regulated because of their constitutionally proscribable content," *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383 (1992); or (2) the statute as applied to the defendant's speech passes strict scrutiny. *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1121 (9th Cir. 2017).

Here, the government will fail to meet its burden, under either method. Mr. Weiss faces a felony charge for criticizing Senator McConnell in his official capacity. Yet, "the Constitution does not allow such speech to be made a crime." *Houston v. Hill*, 482 U.S. 451, 462 (1987).

**A.      The Government Cannot Meet its Burden to Prove Mr. Weiss's Language Falls into one of the Narrow Categories of Proscribable Speech.**

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (internal quotation marks omitted). "As a result, the Constitution demands that content-based restrictions on speech be presumed invalid . . . and that the Government bear the burden of showing their constitutionality." *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 660 (2004). The Supreme Court has delineated certain very narrow categories of speech that can be proscribed consistent with the First Amendment, including: obscenity, fraud, incitement, defamation, speech integral to criminal conduct, and true threats. *See United States v. Osinger*, 753 F.3d 939, 946 (9th Cir. 2014); *Watts v. United States*, 394 U.S. 705 (1969). Speech that does not fall into these exceptions remains wholly protected by the First Amendment.

The government will be unable to prove that Mr. Weiss's speech falls within one of these categories. While the First Amendment does not protect speech which merely provides the means of carrying out a crime, Mr. Weiss committed no underlying criminal act separate and apart from his speech. *See Osinger*, 753 F.3d at 946-48 (citing examples where speech was unprotected because it furthered a distinct criminal act, including tax fraud, extortion, and cyberstalking to cause substantial emotional distress). In *Cohen v. California*, 403 U.S. 15, 16 (1970), Cohen was convicted of

"maliciously and willfully disturbing the peace and quiet of any neighborhood or person by offensive conduct" for wearing a jacket bearing the words "Fuck the Draft" into a courthouse. The Supreme Court held Cohen's conviction "rest[ed] solely upon speech" and not "any separately identifiable conduct." *Id*. at 18. He was not prosecuted not for the act of wearing a jacket, but because of the words written on the jacket. *Id*. So too here. Mr. Weiss's only "conduct" was using the internet to send messages through an elected official's public website. It would be ludicrous to argue this act, akin to wearing a jacket, constitutes a crime. Like Cohen, Mr. Weiss faces prosecution not for his conduct in using the internet to send messages, but because of what was written in those messages.

Nor can the government prosecute Mr. Weiss by labeling his speech "harassment." "There is no categorical 'harassment exception' to the First Amendment's free speech clause." *Rodriguez v. Maricopa County Cmty. College Dist.*, 605 F.3d 703, 708 (9th Cir. 2009). Instead, the First Amendment protects harassing, distressing, abusive, and outrageous speech unless and until it crosses over into one of the unprotected categories of speech listed above, or unless and until its non-speech qualities amount to criminal conduct. *See*, *e.g.*, *id*. at 710; *R.A.V.*, 505 U.S. at 383-84; *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 209 (3d Cir. 2001). Mr. Weiss's speech and conduct broach neither. *See, e.g.*, *United States v. Waggy*, 936 F.3d 1014, 1019 (9th Cir. 2019) (noting that state telephone harassment statute regulated harassing conduct, not speech, because "[t]he gravamen of the offense is the thrusting of an offensive and unwanted communication upon one who is unable to ignore it") (citations omitted).

Finally, the Ninth Circuit's decision in *United States v. Bagdasarian*, 652 F.3d 1113 (9th Cir. 2011) forecloses any argument that Mr. Weiss's messages fall under the "true threats" category. A statement qualifies as a true threat only if it "would be understood by people hearing or reading it in context as a serious expression of an intent to kill or injure" another person. *United States v. Bagdasarian,* 652 F.3d 1113, 1118 (9th Cir. 2011). In reversing Bagdasarian's conviction for threatening to kill President Obama, the Ninth Circuit held that "predictive" and "exhortatory" statements cannot constitute "true threats" and instead receive full First Amendment protection. *Id*. at 1118-19 ("Re: Obama fk the niggar, he will have a 50 cal in the head soon" is merely predictive and "conveys no explicit or implicit threat . . . that he himself will kill or injure Obama;" "shoot the nig" is "an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration");

4

*see also New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) ("[A] person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear. . . . even where a protestor tells the objects of protest that they are in danger and further indicates political support for the violent third parties."). Here, Mr. Weiss's statements are likewise predictive and exhortatory. ("After watching Frontline, the Kentucky Resistance is totally going to execute you. They have stated you are a deadman!"; "Someone needs to kill you!") Like Bagdasarian, not once does Mr. Weiss state that he himself will kill or injure McConnell. Mr. Weiss's speech may have been "vituperative, abusive, and inexact," as "the language of the political arena" often is, but it falls far short of a true threat. *Watts*, 394 US at 708.

### B.  Nor Can the Government Meet its Burden to Prove the Statute Passes Strict Scrutiny as Applied to Mr. Weiss's Speech.

When the government enforces a law restricting speech, and the speech falls outside the narrow categories listed above, it has the burden to show its censoring of speech passes the requisite degree of scrutiny. *Alvarez*, 617 F.3d at 1205. Where the law being enforced is considered "content based," it will be "presumptively unconstitutional and may be justified only if the government proves that [the law as applied is] narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015).

### 1.  Strict scrutiny applies because the statute imposes a content-based restriction on Mr. Weiss's speech.

Applications of seemingly content-neutral laws are subject to strict scrutiny where they "require the authorities to examine the contents of the message to see if a violation has occurred." *Tschida v. Motl*, 924 F.3d 1297, 1303 (9th Cir. 2019); *see also Reed*, 135 S. Ct. at 2227. 47 U.S.C. § 223 (a)(1)(C) criminalizes anonymous use of the internet "with intent to abuse, threaten, or harass any specific person." It does not require a course of conduct through repeated or continuous contact, nor that a specific person actually feel abused, threatened, or harassed. Thus, as a practical matter, the only way for the government to determine who has violated the statute—who has used the internet anonymously with the requisite intent—is to analyze the content of a person's speech. *See United States v. Popa*, 187 F.3d 672, 676 (D.C. Cir. 1999) (suggesting § 223 (a)(1)(C) is a content-based description because of the anonymity requirement, but avoiding issue because the statute also failed intermediate scrutiny);

*McIntyre*, 514 U.S. at 342 (An "author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment.") Indeed, that was the government's exact approach in this case.

To illustrate: imagine a Senator McConnell supporter submitted eight anonymous messages in a one year period using the same contact form, but each message contained supportive comments. The supporter's *conduct* is identical to Mr. Weiss's. But undoubtedly, the hypothetical supporter would not face criminal prosecution, whereas Mr. Weiss stands accused of committing a federal felony. Without looking at the content of the messages, the government would have no mechanism to determine which person has violated the statute and which has not. Because the statute creates a content-based speech restriction, it "is presumptively invalid." *United States v. Stevens*, 559 U.S. 460, 468 (2010). "[T]he Government bears the burden to rebut that presumption." *Id*.

### 2.    Suppressing core political speech is not a compelling government interest.

To pass strict scrutiny, the government must justify its prosecution of Mr. Weiss as the least restrictive means to further a compelling government interest. *Foti v. City of Menlo Park*, 146 F.3d 629, 637 (9th Cir. 1998). The government "must specifically identify an actual problem in need of solving and the curtailment of free speech must be actually necessary to the solution." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011). Strict scrutiny "is a demanding standard. It is rare that a regulation restricting speech because of its content will ever be permissible." *Id*. The government must show not only that § 223 (a)(1)(C) generally serves an actual and compelling interest, but also that its application to Mr. Weiss's speech furthers that interest. Thus, even if the government could prove it has a general interest in protecting individuals from telephone harassment, that rationale would fail to justify the statute's application here, where the Mr. Weiss stands accused of using the internet to send political messages through an elected official's public website.

The government will be unable to prove a compelling justification for prosecuting Mr. Weiss for his core political speech. In *United States v. Popa*, the D.C. Circuit—the sole circuit to address the issue—held § 223 (a)(1)(C) cannot be constitutionally applied to someone who uses the phone intending to harass and abuse a government official over matters of public concern. 187 F.3d at 676. Over the course of a month, Popa called the United States Attorney for the District of Columbia seven

times, uttering verbally abusive and racist insults, including calling the U.S. Attorney "a criminal, a negro," a "criminal with cold blood," and a "whore, born by a negro whore." *Id*. at 673. Applied to Popa, § 223 (a)(1)(C) failed to pass constitutional muster, as the statute prohibited protected core political speech:

> The statute sweeps within its prohibitions telephone calls to public officials where the caller may not want to identify himself other than as a constituent and the caller has an intent to verbally 'abuse' a public official for voting a particular way on a public bill, 'annoy' him into changing a course of public action, or 'harass' him until he addresses problems previously left unaddressed.

*Id*. at 676-77. The *Popa* court noted that even if the government could prove it had a sufficiently important interest in protecting individuals from non-communicative uses of the telephone, punishing people like Popa "who use the telephone to communicate a political message" was not essential to the furtherance of that interest. *Id*. at 677; *see also Waggy*, 936 F.3d 1014, 1018-19 (9th Cir. 2019) (distinguishing *Popa* because "complaints about the actions of a government official" were not a significant component of Waggy's calls); *United States v. Eckhardt*, 466 F.3d 938, 946 (11th Cir. 2006) ("Unlike *Popa*, the instant case does not involve a government official and Eckhardt's calls had virtually no meritorious component."); *United States v. Bowker*, 372 F.3d 365, 379 (6th Cir. 2004), *reversed on other grounds*, 543 U.S. 1182 (2005) (distinguishing *Popa*, as Bowker made calls for the purpose of physically threatening and invading victim's privacy).

Like Popa, Mr. Weiss faces prosecution for sending messages to a government official that contain core political speech. "[C]ommunication concerning political change [] is appropriately described as core political speech," *Meyer v. Grant*, 486 U.S. 414, 414 (1988), "for which First Amendment protection is at its zenith." *Id*. "No form of speech is entitled to greater constitutional protection." *McIntyre*, 514 U.S. at 348. Mr. Weiss sent messages to Senator McConnell utilizing the contact form on McConnell's publicly accessible, official website. Unlike defendants' repeated use of the telephone to invade the privacy of the victims in *Waggy*, *Eckhardt*, and *Bowker*, Mr. Weiss used the internet to interact with Senator McConnell's website in exactly the manner invited. McConnell's website expressly solicits messages from the public: "I welcome your thoughts and concerns and would like to encourage you to share them with me . . . I look forward to hearing from you!" Ex. A. So many people utilize this contact form on McConnell's website that visitors are warned "it may take up to 45

days to receive a response." *Id*. Certainly, receiving eight messages from one person in a year's time would not be unusual for McConnell or overburden his already very busy office.

Though Mr. Weiss's messages are laced with outrageous insults, graphic and hyperbolic imagery, profanity, and racial slurs, the "inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with" a core political issue. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). This is because our society "must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Boos v. Barry*, 485 U.S. 312, 322 (1988). And even if a few of Mr. Weiss's statements were viewed as personal or racial insults toward McConnell and his wife, "that would not change the fact that the overall thrust and dominant theme" of Mr. Weiss's messages related to issues of political concern. *Snyder*, 562 U.S. 443, 454 (2011). Mr. Weiss's statements included frustration and dissatisfaction with McConnell's performance as a government representative: "you single-handedly are killing America," "you are going to lose the next election," "you are a criminal Russian asset," "Scalia was the biggest asshole in the judicial system ever," and "you are going down in 2020." Ex. B. He also mentions "the Resistance," a grassroots, nationwide social movement dedicated to opposing Republicans' and President Trump's agenda by organizing town meetings, marches, protests, and voter registration drives.[2] Ex. B. Mr. Weiss's messages contain protected, hyperbolic political expression, as did Popa's phone calls. The government cannot prove it has a compelling interest in preventing a politically-active citizen from sending political speech to an elected politician in his official capacity.

### 3.  The statute's restriction on speech is not the least restrictive means to serve a compelling governmental interest.

A law is not narrowly tailored "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *In re Nat'l Sec. Letter*, 863 F.3d at 1124. Presumably the government will claim § 223 (a)(1)(C) provides a necessary enforcement tool to protect private citizens from harassment. If that were true, one might expect more than seven prosecutions in the Northern District of California over twenty years. *See* Chuang Decl., Ex. C., ECF

---

[2] For an explanation of "the Resistance," see
https://www.washingtonpost.com/politics/2019/12/31/the-resistance-built-grass-roots-groups-across-us-will-democratic-party-put-that-energy-work/.

Report of Cases Charging Violations of § 223 (a) in NDCA; *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 226 n. 16 (1989) (Claim that statute is necessary to further compelling interest "is called into question . . . because the State has never enforced" it).

But even assuming this governmental interest were compelling, § 223 (a)(1)(C) cannot pass strict scrutiny because its sweep is vastly "overinclusive" and "underinclusive." *Brown*, 564 U.S. at 805. The statute is underinclusive because it offers no protection for someone harassed over the internet by a harasser who discloses his identity. The statute is also seriously overinclusive in that it has no requirement: (1) that a "specific person" actually feel harassed, threatened, or abused; (2) that someone engage in repeated or unwanted communication with the specific person; or (3) that the specific person actually see or be aware of any harassing internet communications. The government cannot achieve its goal of protecting private citizens from harassment with a statute that fails even to require that a specific person feel harassed or that harassing conduct actually occur (as defined by repeated, unwanted contact). The statute's application to Mr. Weiss highlights this problem, as the statute does not carve out protected political speech. *See*, *e.g.*, *Popa*, 187 F.3d at 677 ("[T]he statute could have been drawn more narrowly, without any loss of utility to the Government, by excluding from its scope those who intend to engage in public or political discourse."); *Cassidy*, 814 F.Supp.2d 574, 586 (noting government's interest in protecting others from intentional infliction of emotional distress over the internet would still be furthered if "statute did not apply to individuals engaging in political debates or critiques of religious leaders").

Moreover, § 223 (a)(1)(C) cannot be the least restrictive means to further the government's interest in preventing harassment where a more narrowly-tailored internet harassment law is already on the books, merely two subsections away: 47 U.S.C. § 223 (a)(1)(E) prohibits "repeatedly initiat[ing] communication with a telecommunication device, during which conversation or communication ensues, solely to harass any specific person." *See Buckley v. American Constitutional Law Found.*, 525 U.S. 182, 209 (1999) (First Amendment violated where the conduct at issue was already regulated and the "added benefit" of speech limitation "is hardly apparent" "from the record"). The government will be unable to carry its heavy burden to prove that § 223 (a)(1)(C) as applied to Mr. Weiss's speech passes strict scrutiny.

**II.     On its Face, Section 223 (a)(1)(C) is Unconstitutionally Overbroad and Vague.**

"A facial challenge is an attack on a statute itself as opposed to a particular application" of that statute. *City of Los Angeles v. Patel*, 135 S.Ct. 2443, 2449 (2015). Imprecise laws can be attacked on their face as unconstitutionally overbroad and vague, two distinct but overlapping doctrines. *City of Chicago v. Morales*, 527 U.S. 41 (1999). Both concepts invalidate poorly written laws that have the effect of chilling protected speech and enabling discriminatory enforcement. *Osinger*, 753 F.3d 945. A law is properly struck down as overbroad where "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473. Where "an overbreadth challenge succeeds, the prosecution fails regardless of the nature of the defendant's own conduct." *Wurtz*, 719 F.2d at 1440. Additionally, a law is void for vagueness under the Due Process Clause of the Fifth Amendment "if it fails to draw reasonably clear lines between lawful and unlawful conduct." *Kramer v. Price*, 712 F.2d 174, 176 (5th Cir. 1983) (citing *Smith v. Goguen*, 415 U.S. 566, 574–578 (1974)).

Mr. Weiss challenges §223(a)(1)(C) as both facially overbroad and vague. 47 U.S.C. § 223(a)(1)(C) states: "Whoever . . . utilizes a telecommunications device, whether or not conversation or communication ensues, without disclosing his identity and with intent to abuse, threaten, or harass any specific person ... shall be fined under Title 18 or imprisoned not more than two years, or both." The statute does not define "abuse," "threaten," or "harass." §223(h)(1) clarifies that "telecommunications device" includes devices that transmit communications over the internet.

The Ninth Circuit has never addressed an overbreadth or vagueness challenge to § 223 (a)(1)(C). The only two circuits which have are the Sixth Circuit in *Bowker* and the Eleventh Circuit in *Eckhardt*. But those two cases are not directly on point, as neither case addressed the facial constitutionality of § 223 (a)(1)(C) as it pertains to use of the internet, instead of a telephone. *Bowker*, 372 F.3d 365; *Eckhardt*, 466 F.3d 938. This distinction is critical, as the *Bowker* court's discussion centered on problems unique to anonymous telephone calls that become entirely inapplicable in the internet context. *Bowker*, 372 F.3d at 379 (noting that call recipients cannot merely walk away and ignore unwanted speech or contact; calls target a specific person outside of a public forum; and anonymous calls can instill fear because the victim has no ability to confront the caller). *Bowker*'s conclusion that the

statute's "thrust" was to "prohibit communications intended to instill fear in the victim, not to provoke a discussion about political issues of the day" makes sense in the telephone context. *Id*. One can imagine few legitimate reasons to call someone anonymously with the intent to harass, abuse, or threaten over the telephone. Not so when § 223 (a)(1)(C) "applies broadly to the entire universe of cyberspace," which is designed to "enable[] tens of millions of people to communicate with one another" about a "huge range of subjects." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 850 868 (1997).

A.    **The statute's application to the Internet fundamentally changes its breadth.**

When someone violates § 223 (a)(1)(C) through use of a telephone, he has targeted a specific victim, namely, the person(s) on the receiving end of the number dialed. Not so when using the internet. In *Reno*, the Court struck down as facially overbroad a different subsection of the same statute, 47 U.S.C. § 223 (a)(1)(B), which prohibited "the knowing transmission of obscene or indecent messages to any recipient under 18" over the internet. *Id*. As the *Reno* Court acknowledged, "the Internet is a unique . . . medium of worldwide human communication." 521 U.S. at 850. In contrast to a private telephone line, an enormous amount of internet activity is public. *Id*. at 880 ("most Internet forums— including chat rooms, newsgroups, mail exploders and the Web—are open to all comers"). Unlike phone calls, "communications over the Internet do not invade an individual's home or appear on one's computer screen unbidden. Users seldom encounter content by accident." *Id*. at 869. Sites like Twitter, YouTube, and even comment sections of news websites like the New York *Times* provide modern-day public forums for people completely unknown to each other to communicate. Also in contrast to telephonic communication, a substantial amount of internet activity is anonymous—and not for any malicious or insidious purpose, but because many internet services are designed that way. *See McIntyre*, 514 U.S. at 341-42. (Anonymous speech allows individuals to express themselves freely without "fear of economic or official retaliation . . . [or] concern about social ostracism."); *see also Reno*, 521 U.S. at 855. Many websites permit users to choose an account name that differs from one's legal name. People pick non-legal usernames for a wide variety of reasons, for example, to create humorous parody accounts or to prevent employers from snooping on the details of their personal life. These unique features of the internet lead to bizarre results when paired with § 222 (a)(1)(C)'s "specific person" requirement. Any time anyone on the internet anonymously "abuses," "harasses" or

1   "threatens" someone—even another anonymous user—the statute is violated. This requirement also

2   brings within the statute's ambit anonymous disparaging statements about celebrities and public figures

3   who may be entirely unaware of the comments. *See*, *e.g.*, Chuang Decl., Ex. D at 12 (account user may

4   face prosecution under the statute even though Trump may never discover the parody account).

5   **B.     The statute's lack of definitions exacerbate its vagueness and overbreadth in the**
        **internet context.**

6   The statute's failure to define "threaten," "abuse," and "harass" enhances its vagueness and

7   overbreadth concerns. The statute's undefined terms "will provoke uncertainty among speakers about

8   how the [three verbs] relate to each other and just what they mean." *Reno*, 521 U.S. 871. This is

9   particularly so considering "each of these terms, given their ordinary meaning, can be understood as

10  encompassing forms of expression that are constitutionally protected." *Church of the Am. Knights of*

11  *the Ku Klux Klan v. City of Erie*, 99 F.Supp.2d 583, 591 (W.D. Pa. 2000) (striking down as facially

12  overbroad and vague statute which prohibited wearing a mask "with the intent to intimidate, threaten,

13  abuse or harass any other person"). In *Wurtz*, the Ninth Circuit invalidated a facially overbroad criminal

14  statute which prohibited, "with the purpose to cause another to perform or to omit the performance of

15  any act, communicat[ing] to another a threat to . . . commit any criminal offense." 719 F.2d at 1439.

16  The Court held that the statute swept in a "great deal of protected speech," as "many relatively harmless

17  expressions would come into its purview." *Id*. at 1441-42 (e.g. threats to boycott, picket, organize

18  marches, violate parking meter laws). It concluded, "what is a [true] threat must be distinguished from

19  what is constitutionally protected speech." *Id*. at 1441 (citing *Watts*, 494 U.S. at 707). The same

20  reasoning applies with even more force here, as the statute includes the even more nebulous terms

21  "harass" and "abuse." *See Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 264 (3d Cir.

22  2002) ("'Harassment,' when targeted on the basis of its expressive content, encompasses speech within

23  the area protected by the First Amendment."); Aaron H. Caplan, *Free Speech and Civil Harassment*

24  *Orders*, 64 Hastings L.J. 781, 810–11 (2013) ("'Harassment' has no widely accepted legal definition.

25  Nearly two hundred state statutes contain with the words 'harass' or 'harassment' in their official titles,

26  and they cover a huge range of distinguishable conduct."); *Watts*, 394 U.S. at 708 (noting that speech

27  which is "vituperative, abusive, and inexact" receives full First Amendment protection). An internet

28

12

1    user in an anonymous forum for new moms could "harass" an anti-vaxxer to take her child to the doctor.

2    An internet user could "abuse" Harvey Weinstein on Twitter for his conviction of sexual assault. An

3    internet user could post an anonymous review "threatening" never to return to a stylist who botched

4    her haircut. First Amendment implications are particularly troubling here because § 223 (a)(1)(C)

5    imposes criminal sanctions. *Reno*, 521 U.S. at 872. ("In addition to the opprobrium and stigma of a

6    criminal conviction, the CDA threatens violators with penalties including up to two years in prison.")

7    The threat of a criminal prosecution "may well cause speakers to remain silent rather than communicate

8    even arguably unlawful words, ideas, and images." *Id*.

9           **C.    The statute's intent requirement cannot carry the day.**

10          The only thing that stands between ubiquitous anonymous internet users and two years in federal

11   prison—"other than the mercy of a prosecutor"—is the statute's intent requirement. *Stevens*, 559 U.S. at

12   477. Yet, an intent-based test does nothing to save the statute's overbreadth and vagueness. Words do

13   not lose their First Amendment protections just because they are spoken with ill intent, as "a speaker's

14   motivation is entirely irrelevant to the question of constitutional protection." *Fed. Election Comm'n v.*

15   *Wisconsin Right To Life, Inc.*, 551 U.S. 449, 468 (2007) (internal quotations omitted). One could intend

16   to threaten someone but fall far short of communicating a "true threat;" that person's speech would not

17   receive any less constitutional protection because of his subjective intentions.

18          An intent test also creates an unreasonably high risk of selective or discriminatory enforcement.

19   Officers must evaluate an internet comment by hazarding a "wholly subjective" determination of the

20   speaker's intent. *Williams*, 553 U.S. at 306. But how do officers differentiate between people who use

21   vicious language with the subjective intent to inform or persuade others, and those who use similarly

22   venomous language with the intent to harass or abuse? No objective test guides their way. This guessing

23   game has the added effect of punishing unpopular and minority opinions. An officer may assume the

24   best intentions when someone uses caustic or abusive language to express a view he agrees with; he may

25   not be so willing to give the benefit of the doubt when someone uses similarly sharp language to express

26   a view he finds offensive. The test separating those who engage in constitutionally-protected, anonymous

27   internet speech from those who have committed a felony should "reflect our profound national

28   commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.

                                                          13

A test turning on the intent of the speaker does not remotely fit the bill." 551 U.S. at 467-78.

The statute must be struck down as overbroad and vague, as it "lack[s] the precision that the First Amendment requires when a statute regulates the content of speech." *Reno*, 521 U.S. at 874. The statute fails to give proper notice of precisely what it proscribes and thus potentially reaches an enormous amount of protected internet speech, including:  anonymous websites, blogs, and accounts criticizing public figures; anonymous posts on message boards during heated debates about issues of public concern; anonymous tweets responding to others using sarcastic comments or "abusive" insults. *See* Chuang Decl., Exhibit D. These unconstitutional applications come straight out of "the statute's facial requirements," and no "imaginary" or inventive fact patterns are necessary to expose the statute's constitutional infirmities. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  These constitutional deficiencies will result in arbitrary enforcement and the chilling of protected speech. Thus, the Court should find § 223 (a)(1)(C) facially overbroad and vague, and grant Mr. Weiss's motion to dismiss the indictment.

## CONCLUSION

For the aforementioned reasons, Mr. Weiss respectfully urges the Court to grant his motion to dismiss the indictment on First Amendment grounds.

Dated:    March 4, 2020                                 Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

/S

ANGELA CHUANG
Assistant Federal Public Defender
AMY SENIA
Special Assistant Federal Public Defender

14